Estate of John T. Hagerty, Sr., Deceased, William J. Hagerty, Executor v. Commissioner.
Estate of John T. Hagerty v. Commissioner
Docket No. 8524.
United States Tax Court
1947 Tax Ct. Memo LEXIS 107; 6 T.C.M. (CCH) 964; T.C.M. (RIA) 47236; August 20, 1947
William S. Pritchard, Esq., for the petitioner. Frank H. Thompson and John R. Stivers, Esqs., for the respondent. KERN Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency in estate tax in the amount of $13,967.87, against the Estate of John T. Hagerty, Sr. That part of this deficiency is here in issue which arises by reason of respondent's action in including in the taxable estate certain bonds and building and loan certificates which are alleged by petitioner *108 to have been given by decedent to his sons prior to his death. Findings of Fact A partial stipulation of facts was filed and we find the facts set out therein to be as stipulated. Decedent died testate on March 2, 1941, at the age of 73, a resident of Bessemer, Alabama. He was survived by four sons whose names and ages, in 1935, were: John T., 41; William J., 39; Francis P., 36; and Joseph M., 31. Each of the sons, except Francis, was married and all were living at the time of the hearing in this proceeding. The decedent himself was a frugal and successful business man. He was a devoted and generous father, greatly interested in the success of his sons. The sons welreall college graduates and by 1935 they were employed in various fields of endeavor: William as an accountant in Peoria, Illinois; Joseph as an electrical engineer in Leesville, Louisiana; Frank in the construction business at various points in the South; and John as a traveling salesman out of Bessemer. Beginning as early as 1922 the sons began to deposit certain sums with their father, who invested them for the sons, keeping an accurate account of each sons' investments and earnings, and building up the accounts *109 by the use of his experience and contacts. He sought by this method to encourage thrift and good citizenship in his children. The decedent was particularly close to his sons William and Joseph, with whom he discussed his affairs and intentions in great detail. He was a prodigious correspondent and wrote to his sons with great frequency, sometimes seeking their advice or approval of his actions. The decedent was vice-president and general manager of Long-Lewis Hardware Company. He also had invested in other enterprises, among which was a business known as "John C. Perry, Trustee," which accepted deposits from investors and financed the purchase of automobiles, and generally dealt in automobile finance paper. The decedent had on deposit in that business, as of January 2, 1935, the amount of $51,634.84. On January 2, 1935, he caused his account there to be debited by the amount of $44,000, and caused an account in the amount of $11,000 to be set up in the name of each of his four sons. He advised his sons of the purported gifts and filed a gift tax return reporting them. Each of the donees filed an information return. On October 13, 1936, the business carried on by "John C. Perry, *110 Trustee" was discontinued, and a single check was issued to the decedent in the amount of $48,453.04, representing the aggregate of the four accounts in the names of the decedent's sons, plus accretions thereto. On the same day the decedent deposited the check so received in his personal checking account at the First National Bank of Bessemer, Alabama. He alone was authorized to check against that account. Decedent notified his sons, or at least some of them, of the dissolution of the "John C. Perry, Trustee," business, and "advised" them to invest the proceeds of their interests in Government bonds. Four days later decedent withdrew from his checking account $44,164.95 and purchased four $10,000 and four $1,000 face amount 3 1/8% United States Treasury bonds. These bonds were first placed in decedent's safety deposit box in the First National Bank at Bessemer, and later were moved to a safety deposit box in a Birmingham bank. Decedent alone had access to both these boxes. After the death of decedent they were found in the safety deposit box in Birmingham. Interest coupons were clipped by decedent and deposited in his checking account. During 1938 the decedent purchased certificates *111 in savings and loan associations as follows: Certificate #1101, Birmingham Federal
Savings & Loan Assn.
$5,000
Certificate #207, Woodlawn Federal Sav-
ings & Loan Assn. of Birmingham
5,000
Certificate #I 349, First Federal Savings
and Loan Association of Alabama, Bir-
mingham
5,000
Certificate #I 225, First Federal Savings
& Loan Assn. of Bessemer
5,000
All these were purchased and issued in the decedent's own name and were kept in the decedent's safety deposit box in the First National Bank of Birmingham, Alabama, until his death. All dividends on such certificates were paid to and deposited by decedent in his account at the First National Bank of Bessemer. During 1940 the decedent purchased the following savings and loan certificates, which were issued to "John T. Hagerty, trustee for John T. Hagerty, Jr., Wm. J. Hagerty, Frank P. Hagerty and Joe M. Hagerty": Certificate #I 349, First Federal Savings
& Loan Assn. of Bessemer, Alabama
$5,000
Certificate #I 1294, Birmingham Federal
Savings & Loan Assn., Birmingham,
Alabama
5,000
These, also, were kept in decedent's safety deposit box in Birmingham, and dividends thereon were paid *112 to decedent, who deposited them in his checking account. An envelope, marked "44000.00 Gift to Sons", was found in decedent's safety deposit box after his death and the U.S. Bonds were not inside the envelope, but were in the box. A similar envelope, marked "(6) 5000.00 certificates of Fed Bldg & Loan Asso Total $20000.00," was also in the box. The numeral (6) appeared to have replaced the (4) which was the original notation, and the envelope contained the four certificates purchased in 1939 and the two purchased in 1940. On January 2, 1939, three of the sons of the decedent executed alleged trust agreements, each of which set out the transfer to William J. Hagerty, the fourth son, of the $11,500 in Government bonds and the $5,000 building and loan certificate, and provided that the income of the trusts be paid to decedent during his life, and for disposition thereafter in a manner which is not important here. These trust papers were prepared by a Joe Bartley, an attorney in Peoria, Illinois, at the request of William, who wrote to his father on March 5, 1939, as follows: * * *
"I saw Mr. Bartley last night and he will go to work on the papers he is to draw up for us just *113 as soon as he can. I will send them to you just as soon as I receive them from him. "* * * In addition you should have E & E prepare a Gift Tax Return for the $20,000 you wish to give during 1939, stating that the money was given to each of your four sons, to Wm. J. Hagerty as Trustee, with Joseph M. Hagerty as cotrustee. Mr. Bartley will draw up the trustee papers and I will ask him to date the papers March 6, 1939 so the gift tax return can show the gift as of that date. * * *
"I believe I should sign a receipt for the entire $20,000.00 as trustee, make sure about this point." At this point, it was intended that decedent would give the savings and loan certificates to a trust for his sons, retaining the income therefrom during his lifetime, but this plan was later changed, and reference was made to this change in plan in a letter, dated July 16, 1939, from William to his father: * * *
"I finally got Joe Bartley to prepare the papers I had in mind to take care of the gifts you made to your boys. First the idea was to have to give same in trust but it was found that such gifts 'are' subject to inheritance tax, so we figured the best way was for you to make the gifts *114 outright, which you have done, and to have the boys surrender the amounts to me as 'Trustee' for them, with the provision that the income go to you during your life and also providing that I, as trustee, can re-invest the funds as I see fit. In my own case I could not appoint myself as trustee, but I have taken care of this in my Last Will and Testament, a copy of which is enclosed. "I am sending two copies each of three Trust agreements, one each for Joe, Frank and John. I have signed the original and suggest that you have each boy sign his agreement and give to each boy a copy of the trust for himself. I am retaining a copy which will be kept in my bank box here. There is a vague possibility that if the existence of these trusts are found after you are gone that the Federal and State authorities would rule that the trusts were created as a subterfuge to dodge inheritance taxes, but this is very unlikely. To offset this possibility Mr. Bartley suggested that Amy succeed me as Trustee of the funds in the event of my death and then it would be shown that the intent of the agreements was not to keep the control within the 'immediate' family, or among the children, or your direct heirs. *115 I hope this plan will suit you. I believe you have as much protection as possible, and the trust funds can be increased without any further ado, when, as, and if you see fit to make further gifts. "I suggest that you immediately get the boys to sign, then get the securities given to each, including those given to me and together with the agreements set them aside in separate envelopes. Just as soon as I get home I will rent a bank box in my own name, and after giving a receipt to each boy for his securities will place all of the securities and papers in the separate bank box. Then I will give to you a 'Power of Attorney' to enter the bank box at will, you will have a key and I will have a key, then you can enter the box and clip coupons, etc., whenever you desire. All of the funds will still be directly under your control which is desired. "I hope this rig-marole is not too much for you, but I believe it is the best that can be done to legally eliminate inheritance taxes on the portion of your estate which you are now distributing as gifts. * * *
"[The following was added as a notation in the margin opposite the second paragraph quoted above.] "On second thought maybe *116 you had better not give the boys and papers. Use your own discretion." The alleged trust instruments were signed by each of the three sons, but they, themselves, never had possession of the bonds and certificates, and no delivery of the intended trust corpus was ever made to the named trustee, and no action of any kind was taken pursuant thereto. The decedent frequently gave substantial sums of money to his sons, either upon their request or otherwise, sometimes with the remark that it constituted earnings on their property which he had given them, but no formal accounting of any kind was ever made. His sons believed they received in some form all the income from the alleged gifts made by their father. However, they never received any such earnings direct in the form of dividends or interest, and had no record of such amounts or the dates when they received them, or the property to which they were attributable. The gifts alleged to have been made by decedent to his sons were not valid, completed gifts. Opinion KERN, Judge: The respondent included in decedent's taxable estate the securities which were the subject of alleged gifts by decedent to his children, first, on the *117 theory that decedent did not make valid, completed gifts thereof to his children, and they are therefore includible in the estate under section 811 (a) of the Internal Revenue Code; second, that, if valid gifts were made, they were in contemplation of death or intended to take effect in possession or enjoyment at or after his death, or as to which he retained for his life the possession of or right to the income therefrom; and thus includible under section 811 (c) of the Code. The question whether there is, in any case, an effective inter vivos gift, involves these essential factors: "(1) A donor competent to make the gift; "(2) A donee capable of taking the gift; "(3) A clear and unmistakable intention on the part of the donor absolutely and irrevocably to divest himself of the title, dominion and control of the subject matter of the gift, in praesenti; "(4) The irrevocable transfer of the present legal title and of the dominion and control of the entire gift to the donee, so that the donor can exercise no further act of dominion or control over it; "(5) A delivery by the donor to the donee of the subject of the gift or of the most effectual means *118 of commanding the dominion of it; "(6) Acceptance of the gift by the donee." Adolph Weil, 31 B.T.A. 899, aff'd. 82 Fed. (2d) 561, cert. den. 299 U.S. 552. We have carefully examined all the evidence, and it leads us to the conclusion that the decedent did not intend to divest himself, during his life, of title to or dominion and control over the property involved here. It appears, rather, that it was the intention of the decedent, in which his sons shared, that the securities be set aside with just sufficient appearance of a final completed gift to assure that they would ultimately become the property of his sons, without the payment of any inheritance or estate tax, but without the decedent's parting with his present power to possess, manage and control them, and receive the income therefrom so long as he lived. The fact that the decedent may, in fact, have given his sons, after the date of the alleged gifts all the income received therefrom, or even more, may, and does, establish the fact that he was generous with his sons, but it does not serve the purpose of showing any severance of his control or dominion over the income-producing *119 property. The evidence shows that he made no specific or accurate accounting to his sons as to this property, but simply gave them such sums as they asked for, usually specifying the use they intended making of the money, or such amounts as he wished, from time to time, with the result that the sons felt that they had received at least as much money as the securities had earned. The important facts, in our view, are the complete control exercised by decedent over the investments which constituted the original purported gifts, the fact that none of the securities were purchased in the names of the sons or delivered to the sons, and the fact that the interest or dividends paid thereon were paid directly to decedent and deposited by him in his account. The decedent and all of his sons were men of substantial business experience, who exhibited more than a causal dread of the impact which a coincidence of the two inevitables (death and taxes) would have upon their fortunes. Their every move with respect to these alleged gifts was carefully planned with the hope of escaping estate taxes, but in such a way that "all of the funds will still be directly under your control which is desired", *120 to quote from the correspondence relating to the steps then being contemplated to achieve that end. That the steps they took were insufficient to accomplish the desired result is the inescapable effect of the rule that substance and reality must prevail in any conflict with appearance and form. We therefore conclude there were no valid, completed gifts, and the property which was the subject of the purported gifts was properly includible in the decedent's taxable estate. It is unnecessary to discuss the alternative contention of the respondent. Decision will be entered under Rule 50. *
Footnotes
*. Decision is as amended by Tax Court order dated September 18, 1947.↩